1  ALEX G. TSE (CABN 152348)
   Attorney for the United States
2  Acting under Authority Conferred By
   28 U.S.C. § 515
3
   BARBARA J. VALLIERE (DCBN 439353)
4  Chief, Criminal Division
5  ADAM A. REEVES (NYBN 2363877)
   ROBERT S. LEACH (CABN 196191)
6  Assistant United States Attorneys
7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7157
        Fax:  (415) 436-7234
9       Adam.Reeves@usdoj.gov
10 Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14
   UNITED STATES OF AMERICA,           )   Case No.:
15                                      )
          Plaintiff,                    )   DEFERRED PROSECUTION
16                                      )   AGREEMENT
       v.                              )
17                                      )
   CHRISTOPHER BRADLEY EGAN aka         )
18 STOUFFER EGAN,                       )
                                        )
19        Defendant.                    )
                                        )
20 _____ )

21        The defendant, Christopher Bradley Egan also known as Stouffer Egan, and the United States

22 Attorney's Office for the Northern District of California ("this Office"), enter into this Deferred

23 Prosecution Agreement ("the Agreement").

24 <u>Introduction</u>

25        1.       At or about the time this Agreement is executed, the United States shall file the attached

26 Information ("Attachment A") against the defendant in the United States District Court for the Northern

27 District of California charging him with one count of Conspiracy to Commit Wire Fraud in violation of

28 18 U.S.C. § 1349; the defendant shall voluntarily appear before a Magistrate Judge in the Northern

DEFERRED PROSECUTION AGREEMENT
CR

1  District of California, waive his right to indictment, be arraigned on the Information and enter a plea of

2  not guilty; this Agreement shall then be submitted to the assigned United States District Judge for an *in*

3  *camera* inspection; thereafter, the parties shall jointly request that the case be adjourned for such time as

4  the government may request.

5      2.      The defendant admits and accepts responsibility for the conduct giving rise to the

6  Information. The defendant further admits that all the facts in the attached Statement of Facts (attached

7  hereto as "Attachment B") are true and accurate.

8      3.      As reflected in the statement of facts referred to above, the defendant has acknowledged

9  his criminal conduct to this Office. Furthermore, the defendant came forward and confessed his

10  wrongdoing without any promises of leniency from this Office. This Office enters into this Agreement

11  because it is persuaded that it is in the public interest to do so and because the defendant has satisfied the

12  criteria for such decisions.

13  <u>The Defendant's Promises</u>

14      4.      The defendant promises to cooperate fully and in good faith with this Office, and with

15  any other agency designated by this Office, regarding all the facts and circumstances of this case and

16  any other matters arising out of the investigation that led to the instant Information. In particular, the

17  defendant agrees that his cooperation shall include, but is not limited to, the following:

18      a.      Meeting with this Office when requested to do so and providing
19              complete and truthful information in response to any question
                raised by this Office with respect to the facts and circumstances of
20              the conspiracy to commit securities fraud and any other matters
                within the scope of the investigation that led to the Information;

21      b.      Providing all non-privileged documents, records, or other tangible
                evidence in the defendant's possession, custody, or control
22              concerning these subject matters when requested to do so by this
                Office;

23      c.      Appearing at any trial or other proceeding when requested to do so
24              by this Office and providing complete and truthful testimony in
                response to all questions about the facts and circumstances of this
25              case and any other matters arising out of the investigation that led
                to the instant Information; and

26      d.      Not committing any other crimes.

27      5.      The defendant has resolved the parallel civil enforcement action brought by the United

28  States Securities and Exchange Commission ("SEC"), Administrative Proceeding File No. 3-17678 (the

DEFERRED PROSECUTION AGREEMENT       2
CR

1   "SEC action").   In the SEC action, on or about November 15, 2016, the defendant and the SEC entered

2   into a Cease-and-Desist Order wherein the SEC determined that the defendant participated with others in

3   a scheme to inflate Autonomy's publicly-reported revenues and issue materially false and misleading

4   financial statements by Autonomy between 2009 and 2011 in violation of Sections 17(a)(2) and 17(a)(3)

5   of the Securities Act of 1933.  In agreeing to enter into this Deferred Prosecution Agreement, the United

6   States has relied on the defendant's promises to the SEC, including, but not limited to, the payment of

7   approximately $923,391 in disgorgement, to resolve the SEC action.  Any failure by the defendant to

8   honor and comply with all of his promises in resolving the SEC action shall be a breach of this

9   Agreement as further defined herein.

10       6.    Subject to Paragraph 7, this Agreement shall continue indefinitely during the pendency of

11   all related criminal actions in the United States District Court, including *United States v. Hussain*, CR

12   16-00462 CRB.

13       7.    The final termination of this Agreement shall occur upon delivery of a written notification

14   from the Office to the defendant.  Before any such notice shall be given, however, the defendant

15   promises to submit to the Office a written certification, signed under penalty of perjury, that the

16   defendant has fully complied with all the terms and conditions of this Agreement.

17   The Office's Promises

18       8.    Based on the defendant's willingness to come forward and confess his wrongdoing, admit

19   his responsibility for the conduct giving rise to the Information, and promise to cooperate in good faith,

20   the Office agrees:

21           a.    To move to dismiss the pending Information against the defendant
                   subject to the agreements and understandings set forth herein; and

22
23           b.    Not to prosecute the defendant for any other conduct arising out of
                   the investigation that led to the Information.

24       9.    Other than those explicitly set forth in Paragraph 8, the Office does not make any other

25   promises.

26   Breach

27       10.    The defendant understands and agrees that if he commits a material and knowing breach of

28   this Agreement, the Office may charge the defendant for conduct alleged in the Information and for any

DEFERRED PROSECUTION AGREEMENT        3
CR

other conduct whether contained in the Information or not.  The defendant hereby agrees to proceed by Information and waive in open court prosecution by indictment and otherwise comply in all respects with Federal Rule of Criminal Procedure 7(b).

11.    During the pendency of this Agreement, the defendant stipulates and agrees:

    a.    To waive all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court; and

    b.    To waive any rights under the applicable statute of limitations to any prosecution based on the charges contained in the Information and to any other federal criminal charges that could have been brought arising out of the investigation that led to the instant Information.

The defendant agrees that his waiver of these rights is knowing and voluntary and in express reliance on the advice of counsel and he waives any assertion to the contrary with respect to these rights.

12.    The defendant understands and agrees that this Office alone, acting in its sole discretion, will determine whether the defendant knowingly breached this Agreement as to a material matter.  If, subject to Paragraphs 14 and 15, the Office determines that the defendant has breached the terms and conditions of this Agreement, then this Office will be released from all of its promises but the defendant agrees and acknowledges that he will not be released from any of his promises herein.  In this event, the defendant agrees and acknowledges that he may be prosecuted for any federal criminal violation whether contained in the Information or not.

13.    In the event of a breach of this Agreement and any resulting prosecution for the charges in the Information and any other charges, the defendant agrees, in the trial or adjudication of those charges:

    a.    To stipulate to the admissibility into evidence of the statement of facts contained herein, and agrees not to offer any contradictory evidence or arguments;

    b.    To stipulate to the admissibility of all statements made by the defendant (including all statements made during so-called proffer sessions and notwithstanding any other agreements made at the time of those proffer sessions and including this Agreement) and agrees not to offer any contradictory evidence or arguments; and

    c.    To waive any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, or any other rule, that statements made by the defendant prior to or subsequent to this Agreement, or any leads derived therefrom, should be inadmissible or suppressed.

DEFERRED PROSECUTION AGREEMENT        4
CR

14.     Should it determine that the defendant has breached any provision of this Agreement, the Office shall provide notice to the defendant of the alleged breach and provide the defendant with a two-week period in which to make a presentation to the Office to demonstrate that no breach has occurred, or, to the extent applicable, that the breach is not a knowing or material breach, or has been cured.

15.     If the defendant disputes any determination by the Office that there has been a breach of this Agreement, the defendant understands and agrees that his only recourse to reinstate the Agreement shall be to move to dismiss any subsequent charges brought by this Office before the United States District Court on the sole basis that no breach has occurred, or, to the extent applicable, that the breach is not a knowing or material breach, or has been cured.  The defendant explicitly waives any other basis for moving to dismiss any subsequent charges brought by this Office based on the facts and circumstances of this case and any other matters arising out of the investigation that led to the instant Information.

Conclusion

16.     It is understood that this Agreement is binding on the defendant and this Office, but specifically does not bind any other federal agencies, or any state or local law enforcement or licensing authorities.  If requested to do so, this Office will bring the cooperation of the defendant and his compliance with the obligations under this Agreement to the attention of other federal agencies and state and local law enforcement or licensing authorities.

17.     This Agreement may not be modified except in writing signed by all the parties.

Date:   November 27, 2017                              Respectfully submitted,


                                                       ALEX G. TSE
                                                       Attorney for the United States
                                                       Acting under Authority Conferred
                                                       by 28 U.S.C. § 515


                                                       _____
                                                       ADAM A. REEVES
                                                       ROBERT S. LEACH
                                                       Assistant United States Attorneys

DEFERRED PROSECUTION AGREEMENT          5
CR

Agreed and Accepted:

Date:  November 27, 2017

CHRISTOPHER BRADLEY EGAN aka
STOUFFER EGAN

Date:  November 27, 2017

MILES F. EHRLICH, ESQ.
AMY E. CRAIG, ESQ.
Ramsey & Ehrlich LLP
Counsel to Christopher Bradley Egan aka
Stouffer Egan

DEFERRED PROSECUTION AGREEMENT          6
CR

# ATTACHMENT A

1  ALEX G. TSE (CABN 152348)
   Attorney for the United States,
2  Acting Under Authority Conferred By
   28 U.S.C. § 515
3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                    SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              )  Case No.
                                           )
12          Plaintiff,                     )  VIOLATION: 18 U.S.C. § 1349 –
                                           )  Conspiracy to Commit Wire Fraud
13      v.                                 )
                                           )  SAN FRANCISCO VENUE
14  CHRISTOPHER BRADLEY EGAN aka           )
    STOUFFER EGAN,                         )
15                                         )
            Defendant.                     )
16  _____)

17                    I N F O R M A T I O N

18          The Attorney for the United States charges:

19                    Introductory Allegations

20          At all times relevant to this Information, unless otherwise indicated:

21  A.      Autonomy Corporation plc

22          1.      Autonomy Corporation plc ("Autonomy") was a company incorporated in England and

23  Wales with a registered office in Cambridge, United Kingdom.  Autonomy was the holding company of

24  a group of companies engaged in software development and distribution.  Autonomy maintained dual

25  headquarters in San Francisco, California, and Cambridge.

26  / / /

27  / / /

28  / / /

INFORMATION

2.     Autonomy's major subsidiaries included Autonomy, Inc. ("AU Inc."), with offices in San Francisco and San Jose, California; Interwoven, Inc. ("Interwoven"), with offices in San Jose; and ZANTAZ, Inc. ("Zantaz"), with offices in Pleasanton, California.

3.     Autonomy was a public company whose shares were listed on the London Stock Exchange under the trading symbol "AU" and were bought, held, and sold by individuals and entities throughout the United States.  In 2010, $592,358,000 of Autonomy's $870,366,000 in reported revenues (approximately 68%) came from the United States and other countries in the Americas.

4.     Sushovan Tareque Hussain, a co-conspirator, was a resident of the United Kingdom. From approximately June 2001 until November 2011, he was Chief Financial Officer of Autonomy.  He also was a director of Autonomy from approximately June 2003 until November 2011.  Hussain was a qualified Chartered Accountant.

5.     As Autonomy's most senior finance officer, Hussain was responsible for the preparation of Autonomy's financial statements.

B.     The Defendant

6.     Defendant CHRISTOPHER BRADLEY EGAN aka STOUFFER EGAN was a resident of California.  From approximately 2001 to 2011, he worked as a sales representative for Autonomy in the United States.  In or about 2008 to 2011, EGAN was the Chief Executive Officer and head of sales for Autonomy in the United States and worked principally at Autonomy's headquarters in San Francisco, California.

C.     Hewlett-Packard Company

7.     Hewlett-Packard Company ("HP") was a Delaware corporation with principal executive offices in Palo Alto, California.  HP provided computing and imaging products, technologies, software, and services to customers.

8.     HP was a public company whose shares were listed on the New York Stock Exchange under the trading symbol "HPQ" and were bought, held, and sold by individuals and entities throughout the United States.  HP securities were registered with the Securities and Exchange Commission under Section 12 of the Securities Exchange Act of 1934.

/ / /

INFORMATION                                2

D.    HP's Purchase of Autonomy

9.    On or about August 18, 2011, HP and Hewlett-Packard Vision B.V. ("HP Vision"), an indirect wholly-owned subsidiary of HP, entered into an Offer Agreement with Autonomy and publicly announced an offer to acquire Autonomy for approximately $11 billion.

10.    On or about August 18, 2011, in a press release announcing the acquisition, HP emphasized that "Autonomy's recent operating and financial performance has been strong."  HP also stated that "[o]ver the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." Among the acquisition's "[s]trategic and financial benefits," HP said Autonomy would enhance HP's financial profile because "Autonomy's strong growth and profit margin profile complement[ed] HP's efforts to improve its business mix by focusing on enterprise software and solutions.  Autonomy [had] … a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010."

11.    Under the terms of the offer, HP, through HP Vision, offered to buy all the outstanding shares of Autonomy for £25.50 ($42.11) per share in cash.

12.    On or about October 3, 2011, when all conditions relating to the offer had been satisfied, HP's acquisition of Autonomy closed and HP acquired control of Autonomy.

E.    Autonomy's Financial Statements

13.    From in or about 2004 to in or about July 2011, Autonomy issued quarterly and annual financial statements to the investing public in the United Kingdom, the United States, and other places. In its statements to the public, Autonomy said that the financial statements were prepared in accordance with regulations for public companies in the United Kingdom.  Autonomy also stated that its annual financial statements were audited, and its quarterly financial statements were reviewed, by an independent auditor in the United Kingdom.

14.    In its quarterly and annual reports, Autonomy stated that its financial statements had been prepared in accordance with International Financial Reporting Standards ("IFRS") and, in particular, the accounting requirements for revenue recognition defined by International Accounting Standard 18 –

INFORMATION                                3

Revenue ("IAS 18").  In its quarterly and annual financial statements, Autonomy made statements about the "revenue" it recognized in the quarter and its "gross margin," an alleged measure of its profitability.

15.     For example, Autonomy, in its quarterly financial statements, claimed to have revenue (in millions of U.S. dollars) and a gross margin in the approximate amounts specified below:

| Quarter | Revenue | Gross Margin |
|---------|---------|--------------|
| Q1 2009 | $129.8 | 91% |
| Q2 2009 | $195.2 | 89% |
| Q3 2009 | $191.6 | 85.6% |
| Q4 2009 | $223.1 | 89.4% |
| Q1 2010 | $194.2 | 88.9% |
| Q2 2010 | $221.1 | 86.3% |
| Q3 2010 | $210.6 | 87.6% |
| Q4 2010 | $244.5 | 86.3% |
| Q1 2011 | $219.8 | 88.3% |
| Q2 2011 | $256.3 | 87.1% |

16.     In its annual reports and elsewhere, Autonomy held itself out as a "pure software" company.  For example, in its 2009 annual report, Autonomy claimed it "operates in the realm of pure software."  It stated: "Autonomy is one of the very rare examples of a pure software model."

F.     HP Relied on Autonomy's Financial Statements

17.     Between January and August 2011, Autonomy representatives gave and otherwise provided Autonomy's financial statements and documents reflecting Autonomy's results for the year ended 2009, the year ended 2010, the first half of 2011, and other periods to persons at, or acting on behalf of, HP in the course of HP's consideration of whether to buy Autonomy and, if so, for what price.

18.     Among other information, HP relied on the accuracy and truthfulness of the statements and disclosures made in Autonomy's historically reported financial statements including, but not limited to, Autonomy's claims about its financial performance and revenues and its claim to be a "pure software" company with high gross margins.

INFORMATION                                4

The Scheme to Defraud

19.     In or about Autonomy's first quarter 2009, which began in January of 2009, EGAN, together with others, including Hussain, engaged in a fraudulent scheme to deceive purchasers and sellers of Autonomy securities about the true performance of Autonomy's business, its financial condition, and its prospects for growth.

20.     The objectives of the scheme to defraud were, among other things, to ensure that Autonomy reported that it had met or exceeded projected quarterly results for, among other things, revenue, gross margin, net income, and earnings per share, and to artificially increase and maintain the share price of Autonomy securities.

21.     In or about early 2011, Hussain, and others, met with representatives of HP about a potential acquisition of Autonomy by HP.  At or about that time, Hussain, and others, used Autonomy's false and misleading financial statements from 2009, 2010, and early 2011 to make Autonomy more attractive to a potential purchaser like HP.

22.     In furtherance of the scheme to defraud, EGAN used a variety of means and methods, including:

        a.     Artificially inflating revenues by, among other things, (i) backdating written agreements to record revenue in prior periods; (ii) recording revenue on contracts that were subject to side letters or other agreements with contingencies or other terms impacting revenue recognition; (iii) recording revenue for reciprocal or roundtrip transactions whereby Autonomy granted a software license to a counterparty which purchased product or services from Autonomy at a greater price; (iv) recording revenue where all of the criteria in IFRS, IAS 18, and Autonomy's revenue recognition policy had not been satisfied; and (v) structuring or restructuring contracts to accelerate revenue recognition while reducing future recurring revenue;

        b.     Making false and misleading statements to Autonomy's independent auditor about the facts and circumstances of transactions allegedly supporting the recognition of revenue, expenses, costs, and other items in Autonomy's financial statements, including, but not limited to, backdating contracts, invoices, agreements, and other documents in order to make it appear that they had been reached with a counterparty in a prior period; and

INFORMATION                                5

1        c.       Facilitating the issuance of materially false and misleading quarterly and annual

2  reports.

3       23.    As part of the scheme to defraud, Hussain, and others, caused Autonomy to make

4  materially false and misleading statements directly to HP regarding Autonomy's financial condition,

5  performance, and business, including:

6       a.      Making false and misleading statements regarding the nature of Autonomy's

7  products and concealing Autonomy's non-appliance hardware sales;

8       b.      Making false and misleading statements regarding Autonomy's top customers;

9       c.      Making false and misleading statements regarding Autonomy's top contracts; and

10       d.      Making other false and misleading statements during HP's "due diligence" about

11  Autonomy prior to announcing the acquisition.

12  <u>COUNT ONE</u>:      (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

13       24.    The factual allegations in Paragraphs 1 through 23 are re-alleged and incorporated by

14  reference.

15       25.    Beginning in or about Autonomy's first quarter 2009, which began in January of 2009,

16  and continuing until in or about October 2011, in the Northern District of California and elsewhere, the

17  defendant,

18            CHRISTOPHER BRADLEY EGAN aka STOUFFER EGAN,

19  and others, did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to

20  a material matter and to obtain money and property by means of materially false and fraudulent

21  pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of

22  executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by

23  means of wire communication in interstate and foreign commerce, certain writings, signs, signals,

24  pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

25               <u>Means and Methods of the Wire Fraud Conspiracy</u>

26       26.    In furtherance of the conspiracy and to effect the objectives thereof, on or about the dates

27  listed below, in the Northern District of California and elsewhere, EGAN, and others, used the following

28  means and methods, among others:

INFORMATION                   6

a.      On or about April 23, 2009, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2009.

b.      On or about July 16, 2009, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2009.

c.      On or about October 20, 2009, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2009.

d.      On or about December 31, 2009, EGAN signed a First Amendment to License and Distribution Agreement with a counterparty in the United States whereby the counterparty licensed "EDD" or electronic data discovery software for approximately $4 million plus maintenance and support.

e.      On or about February 3, 2010, Autonomy issued a press release about, among other things, its financial performance in the fourth quarter (year-end) of 2009.

f.      On or about February 22, 2010, Autonomy issued its Annual Report and Accounts for the year ended 31 December 2009.

g.      On or about March 10, 2010, Autonomy paid a counterparty $1,425,000, by means of a check written on an account maintained at a financial institution in San Francisco, for "EDD Processing" that was not performed.

h.      On or about April 1, 2010, EGAN called the principal of a counterparty in the United States and asked if the counterparty would agree to a transaction to license software from Autonomy, which ultimately was recorded as revenue in the first quarter of 2010.

i.      On or about April 21, 2010, Autonomy issued a press release about, among other things, its financial performance in the first quarter of 2010.

j.      On or about July 22, 2010, Autonomy issued a press release about, among other things, its financial performance in the second quarter of 2010.

k.      On or about October 19, 2010, Autonomy issued a press release about, among other things, its financial performance in the third quarter of 2010.

INFORMATION                                7

1    l.      On or about January 18, 2011, Hussain caused an Autonomy employee in San

2    Francisco to backdate a draft, unexecuted license agreement with a counterparty.

3    m.      On or about January 26, 2011, EGAN and Hussain caused an Autonomy officer to

4    email a backdated license agreement to Autonomy's independent auditors.

5    n.      On or about February 1, 2011, Autonomy issued a press release about, among

6    other things, its financial performance in the fourth quarter (year-end) of 2010.

7    o.      On or about February 22, 2011, Autonomy issued its Annual Report and Accounts

8    for the year ended 31 December 2010.

9    p.      On or about April 4, 2011, EGAN directed a counterparty to prepare and backdate

10   an agreement to license Autonomy software, which ultimately was recorded as revenue in the first

11   quarter of 2011.

12   q.      On or about April 14, 2011, EGAN and Hussain met in San Francisco with the

13   counterparty and discussed a backdated licensing agreement.

14   r.      On or about April 21, 2011, Autonomy issued a press release about, among other

15   things, its financial performance in the first quarter of 2011.

16   s.      On or about July 27, 2011, Autonomy issued a press release about, among other

17   things, its financial performance in the second quarter of 2011.

18          All in violation of Title 18, United States Code, Section 1349.

19   DATED:  November 27, 2017                    ALEX G. TSE
                                                  Attorney for the United States,
20                                                Acting Under Authority Conferred By
                                                  28 U.S.C. § 515
21

22

23                                                _____
                                                  JOHN HEMANN
24                                                Deputy Chief, Criminal Division

25   (Approved as to form: _____)
                           AUSA ROBERT S. LEACH
26

27   (Approved as to form: _____)
                           AUSA ADAM A. REEVES
28

INFORMATION                          8

# ATTACHMENT B

**ATTACHMENT B**

**STATEMENT OF FACTS**

**Background and Career at Autonomy, Inc.**

I, Christopher "Stouffer" Egan, began my career in software sales in the mid-1990s, in my second job after graduating from college. One of my first jobs in the field was working for Dataware Technologies, a software search company based in Massachusetts. Ultimately, Dataware wasn't successful and Autonomy was one of the companies I approached to sell Dataware's assets. I was impressed with Autonomy and applied for a job. In March 2001, I took a sales position with Autonomy. Within six months I was named the head of East Coast sales, and within a year I was promoted to head of sales for all of the U.S. Although my title changed over time, my job was always sales-oriented.

**Reporting Structure**

My primary manager changed over time from Richard Gaunt, one of Autonomy's founders, to Sushovan Hussain. Although Hussain was Autonomy's Chief Financial Officer, he operated as the de facto Head of Sales for the entire company.

Hussain was a very detail-oriented, hands-on manager. He often tracked deals in more detail than direct sales managers themselves. Hussain kept in close contact with the sales force, instructing them regarding what deals to pursue and amounts to negotiate. He maintained his own spreadsheet to track Autonomy's sales pipeline and projections and closely monitored efforts to close deals. Hussain would frequently get directly involved in a deal, meeting with customers and resellers. For large deals, Hussain would frequently make or approve all key decisions regarding a deal.

Hussain generally came to the United States 4-5 times per year, usually for meetings in San Francisco. Most days I spoke to Hussain by phone. Towards the end of a quarter I would speak to him multiple times a day. Hussain knew every deal in the U.S. pipeline, and he would emphasize the revenue targets he needed the U.S. to hit to help him meet the larger company target and meet revenue expectations each quarter. Globally, he spoke of being under great pressure. In turn, I was put under constant pressure to make U.S. deals bigger to fill the overall revenue gaps Hussain identified between his target and his forecast. The pressure to close deals was particularly intense at the end of each quarter. Hussain often indicated that the U.S. provided the majority of Autonomy's global revenue each quarter.

**Using Resellers to Accelerate Revenue**

Autonomy often sold its software through resellers who provided additional services and support to the end users in addition to marketing and selling Autonomy's software. But in the first quarter of 2009, Autonomy started to approach resellers to purchase deals that were not going to close by the end of the quarter with the intended end user. The sole purpose of selling these deals to resellers was to allow Autonomy to recognize the revenue for the deal in the quarter.

1

When Autonomy first started engaging in deals of this type, there was little risk that the deal would not ultimately sell through to the end user. I was only told to take deals to resellers when there were assurances the deal would close, but there was a delay in getting the necessary contracts signed before quarter end.

In a number of these deals, the resellers added no value to the end customer. The resellers did not have relationships with the end customer, they did not offer support or services, and they were not involved in selling the deal. Autonomy remained responsible for closing the deal with the ultimate end user. The resellers' real value, for which they were paid a substantial fee, was to provide a vehicle through which Autonomy could recognize revenue in the quarter.

Hussain ultimately determined which deals, and in what amounts, would be taken to a reseller, and which reseller to approach. Given the significant financial cost of these deals, no one else had the authority to make that decision.

In his role as CFO, Hussain gave me specific instructions to follow so that these deals would be accepted by auditors, including what I could say to resellers. For instance, before a reseller could be approached with a deal, Hussain first had me collect the resellers' financial status so he could choose a reseller with sufficient financial reserves to pass auditors' scrutiny. Once Hussain chose which deal to take to which reseller, it was my job to contact the reseller and ask them to accept the deal. Hussain provided guidance regarding what was acceptable and not acceptable to communicate in these conversations. He laid out explicit rules about what could be offered as incentive, what was required of the reseller, and what could not be part of any deal. For example, Hussain emphasized that it was vital that the resellers would accept confirmation letters from the auditors confirming that the reseller owed money to Autonomy and intended to pay. Per Hussain's instructions, I had to be clear with resellers that they were responsible for making payments, however, Hussain allowed me to provide resellers assurances that Autonomy would do everything in its power not to leave the reseller "holding the bag."

At Hussain's direction, I explained to the reseller various options Autonomy had to "fix" a situation where a deal did not ultimately close with an end user. For example, I told resellers that Autonomy had the option to channel another deal to sell through the reseller to make them whole. Hussain also offered that Autonomy could buy products from the reseller to offset a loss from a deal that did not sell through. Hussain followed through on these pledges in multiple cases. However, Hussain always made clear that these assurances were voluntary and could be rescinded by Hussain himself or any subsequent management, and could not be documented in writing.

**Roundtrip Transactions**

After the 2008 financial crisis, Autonomy was doing large multimillion dollar deals and revenue goals were always going up. One of the ways in which Autonomy met the larger goals was to do roundtrip transactions with customers whom had a product Autonomy could buy. Hussain directed me to find "quid pro quo" deals—deals in which Autonomy could buy goods or services from another company, and in turn, that company would use the funds from the sale to purchase software from Autonomy. The point of these deals was effectively to find revenue for

Autonomy that was easier to get than a conventional sale because the buyer was getting something good for their own business in return.

In March of 2009, I saw an opportunity for Autonomy to enter a quid pro quo arrangement with Capax, a reseller. I knew that Capax wanted to get into the electronic data discovery (EDD) business, but didn't have the resources to invest in the infrastructure to handle the work. I pitched a deal in which Capax would buy $7 million of Autonomy software on the condition that Autonomy would underwrite the purchase and commit to paying Capax a monthly fee that would fund the purchase. I took the idea to Hussain, who advised on the appropriate structure. At Hussain's instruction, Autonomy agreed it would pay Capax a monthly fee to underwrite its infrastructure costs but not formally document this agreement. Instead, Autonomy issued purchase orders (POs) one month at a time for "outsourced specialized EDD services" in volumes of 1,250 GB of data at $200 per GB. These POs implied falsely that the services were being rendered. Based on these POs, Autonomy paid Capax $250,000 a month, even though Capax did not provide these services, and for much of the time was not even capable of providing any EDD services. Autonomy ultimately paid Capax millions of dollars for EDD services that were never performed.

I knew that it was wrong and bad business to pay Capax for work it was not performing and that the deceptive EDD purchase orders were just a vehicle akin to a false retainer for Autonomy to fund the reciprocal Capax purchase of Autonomy software. My mentality at the time was that if there was a plausible rationale for a deal that met Hussain's criteria, the deal was acceptable to do. I rationalized the transaction by telling myself that if Hussain wanted to spend an exorbitant amount of money to buy some revenue, and both the revenue and the expense were visible on the books, it was his decision to make and he knew better than I did what was permissible.

Hussain gave me strict criteria that needed to be met for these deals to pass muster with the auditors. To "make the case" that the revenue from these deals could be recognized, I wrote emails detailing how Autonomy would get real value from the products being purchased. But in reality, I knew that Autonomy would never have purchased the products without a reciprocal purchase from the reseller.

I also wrote emails suggesting that the purchase price was the result of real negotiations with the reseller. But, in truth, there were not real negotiations. Hussain dictated the terms of each deal, and I would relay those terms to the resellers who, for the most part, eagerly accepted the terms of the proposed quid pro quo transaction because Autonomy always paid the reseller substantially more than what the reseller was required to pay Autonomy.

I disliked these deals as they did not contribute to any of my personal goals and only served to boost the company targets to where they were always harder for me to hit in subsequent quarters. I justified my participation in these deals by telling myself that the auditors would see all the paperwork and know that, even though contractually separated, these deals must be implicitly related, given that they were to and from the same reseller. Yet I followed Hussain's explicit guidance to never link the transactions in contracts or even in messaging about the deals.

I relied upon Hussain's assurances that while these deals were "undesirable" and had no, low, or negative margin, they were technically allowed. Rather than push back or question the propriety of the transactions, I agreed to actively look for quid pro quo deals. I relied on Hussain's assurances that as long as the deal met the criteria he set out, it was acceptable to recognize as revenue under the International Financial Reporting Standards (IFRS).

**Bank of America Deal and Backdated Paperwork**

In the last quarter of 2010, Autonomy was on the cusp of closing a more than $20-million-dollar deal with Bank of America. Towards the end of December, Autonomy learned that Bank of America would not be able to sign the deal before the quarter closed. As it had done before, Autonomy decided to take the deal to resellers in order to recognize the revenue in Q4 2010. The deal was very large and Hussain instructed that it should be broken into smaller pieces and sold to different resellers. One of the resellers did sign off on a portion of the deal before the end of Q4 2010. However, the bulk of the overall Bank of America deal was not apportioned to resellers until Q1 2011. In late January 2011, as the deal with Bank of America was closing, Hussain instructed me to help apportion additional amounts of the deal to resellers. He requested that the paperwork be effective and dated December 31, 2010, despite the fact that the portions of the deals in question had not been agreed upon until late January 2011. I did as Hussain requested and reached out to resellers on January 25, 2011, and asked them to sign paperwork with a date of December 31, 2010, without making any changes or modifications.

Given the somewhat complex way in which the Bank of America deal was divvied up between multiple resellers, and the fact that one large portion of the deal was "repurposed" to substitute in for a different end user on an earlier reseller deal, it did not register with me at the time that one of the backdated agreements may have enabled Autonomy to recognize several million dollars of new revenue that had not been concluded in the prior quarter. This agreement did so by retroactively enlarging the value of what the reseller had committed to purchase during the prior quarter. Had I stopped to consider the content of this particular agreement more carefully, I believe I would have realized that retroactively expanding an earlier deal was not permitted—or was at least inconsistent with the quarter-end timing rules that I had operated within for years. At that time, however, I did not give this document appropriate consideration, which I regret.

**Backdating the Prisa Deal**

A few months later, in the beginning of April of 2011, Hussain called me and told me that revenue looked short for Q1 2011, that had closed a few days before, and he needed me to sell a new deal to a reseller to make up the revenue shortfall for the quarter. In order to fill the revenue gap, Hussain needed a reseller to buy a deal for end user Prisa and backdate it to reflect an effective closing date of March 31, 2011. This was the first time that Hussain asked me to sell a deal to a reseller after the quarter had closed and have the reseller backdate the deal to an effective closing date in the quarter.

I knew it was wrong, but despite my concerns, I did as Hussain asked. On or around April 4, 2011, I personally reached out to Dave Truitt of Discovertech and asked him to accept the Prisa

4

deal and date the contract March 31, 2011, so that Autonomy could recognize the revenue for the deal in Q1.

Dave Truitt had misgivings about backdating the Prisa deal. On April 14, 2011, about a week after the deal was signed, Hussain, Truitt, and I met in person at Autonomy's office in San Francisco. During this meeting, Truitt told Hussain that he did not like backdating the Prisa deal and would not backdate any documents in the future. Hussain assured Truitt that the Prisa agreement was okay and that they had not done anything wrong. Hussain also assured Truitt that he would not be asked to backdate any documents going forward.

**The Lead Up to the Acquisition**

Throughout 2011 the pressure to meet higher quarterly revenue targets increased. By June 2011, I was ready to quit due to the endless pressure to deliver big deals. When I told senior management in the UK that I wanted to resign, I was told to keep going and that I must "own" the big deals and "run them." When it became obvious that Autonomy would not meet its revenue targets based on the number of deals that were probable to close in the quarter, Hussain instructed me to bring a deal to a reseller to close the revenue gap, even when it was probable that deal might never close.

At the end of Q2 2011, on or around June 30, 2011, Hussain told me to ask Microtech to buy a $7M software package for end user HP. But Hussain and I knew at the time that HP was not interested in buying Autonomy's software. I had already pitched the software to HP as a fix for its customers, like the United States Postal Service (USPS), who were experiencing issues with an older version of HP's software. But HP showed little to no interest in the idea, and barely engaged in pitch discussions. Nevertheless, based on the premise that HP should theoretically be interested in buying Autonomy software, Hussain had me sell the deal to Microtech on the last day of the quarter. Neither Autonomy nor Microtech ever closed a deal with HP for that software.

Less than two months later, on August 18, 2011, it was announced that Autonomy was being acquired by HP. Hussain came back to San Francisco to meet with the U.S. team about the news.